**William E. HOWELL; Bonnie L. Howell, Plaintiff,**

v.

**MIDWAY HOLDINGS, INC.; Nissan Motor Acceptance Corporation, Defendant.**

**No. CV–02–0962–PHX–NVW.**

United States District Court, D. Arizona.

March 28, 2005.

**Background:** Lessees brought action against lessor and lessor's assignee alleging violations of Federal Consumer Leasing Act (CLA) and state law in connection with its claim for excess mileage charge under motor vehicle lease agreement. Lessor filed counterclaim to reform agreement. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, Wake, J., held that:

(1) lease agreement, rather than buyer's orders, constituted final contract between lessor and lessees;

(2) lessor's alleged unilateral mistake in omitting mileage limitation from lease agreement did not change parties contractual obligations; and

(3) fact issues remained as to whether lessor committed deceptive or fraudulent act.

Hyung Sik Choi, Veronika Fabian, Choi Rhee & Fabian PLC, Floyd W. Bybee, Esq., Floyd W. Bybee PLLC, Tempe, AZ, for Plaintiffs.

Benjamin C. Thomas, Esq., Thomas & Elardo PC, Phoenix, AZ, for Defendants.

## ORDER

WAKE, District Judge.

The court has before it Defendant Midway Holding Inc.'s Motion for Summary Judgment (Doc. # 137) and Plaintiffs William and Bonnie Howell's Response in Opposition to Defendant's Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment (Doc. # 144). The standards for determining motions for summary judgment are well known to counsel and to the Court. *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542 (9th Cir.1989).

## I. Background

On November 9, 1997, Plaintiffs the Howells and Defendant Midway entered into a thirty-nine month Motor Vehicle Lease Agreement ("Lease Agreement") for a 1998 Infinity I–30. (Defendant's Statement of Facts ("DSOF") ¶ 1; Plaintiffs' Statement of Facts ("PSOF") ¶ 5.) Midway subsequently assigned its rights to Nissan Motor Acceptance Corporation ("NMAC"). (DSOF ¶ 11.) The Howells made all payments under the Lease and returned the vehicle at the end of the term with 53,399 miles on the odometer. (PSOF ¶ 32.) Shortly thereafter they received a letter from NMAC demanding they pay an excess mileage charge of $733.04. (*Id.* ¶ 34.) The Howells refused to pay the charge because the Lease Agreement they signed listed "N/A" (not applicable) in the section for mileage limitation. (*Id.* ¶ 11; DSOF ¶¶ 11, 13.) In July of 2001 NMAC sent the Howells a copy of the Lease Agreement Midway had sent to it. On this copy someone had written "15,000" and made a marking resembling initials above the "N/A" in the mileage limitation section. (PSOF ¶¶ 36–7.) The Howells denied they consented to a 15,000 mile per year limitation and said someone had forged their initials. (*Id.* ¶¶ 35, 38.) They also supplied NMAC with their copy of the Lease Agreement showing no mileage limitation. Nonetheless, NMAC persisted in demanding payment and reported the Howells' account to credit reporting agencies as a charge-off. (*Id.* ¶ 35.)

On May 22, 2002, the Howells brought this action for violations of the Federal Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667, *et seq.*, and the Arizona Consumer Fraud Act ("ACFA"), A.R.S. § 44–1522, *et seq*, breach of contract, and punitive damages. Summary judgment on the CLA claim was previously granted in Defendant's favor. In March 2004 the Howells filed an Amended Complaint adding a negligence claim, which has since been withdrawn. Midway then asserted a counterclaim for reformation of contract. Midway moved for summary judgment on the Howells' ACFA, breach of contract, and punitive damages claims. The Howells cross-move for summary judgment on liability for the breach of contract claim.

## II. Analysis

### A. Breach of Contract Claim

■ The Howells allege that Midway's "unauthorized alteration of the Lease constitutes a breach of contract." (Am. Compl.¶ 75.) To prevail on a breach of contract claim, the Howells must show the existence of a contract, breach of that contract's terms, and resulting damage. *See Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). In this case the parties agree there is a contract but disagree as to which documents constitute the contract. Either Mr. Howell or both Howells signed three relevant documents while at the dealership: a Buyer's Order with a handwritten notation of "36 mo lease ... 12K/yr"; a typed Buyer's Order with no indication of the lease's length or mileage limitation; and the Lease Agreement for a 39 month term with no mileage limitation. The Howells argue that the Lease Agreement represents the final and only contract between the parties. Midway maintains that the Buyer's Order is the contract and its terms were merely "memorialized" in the Lease. (Def. Mot. at 7.)

#### 1. The Buyer's Orders

The parties disagree about what stage in the negotiation process the Buyer's Order is completed, with the Howells claiming it is during negotiations and Midway claiming it is after a deal has been reached (though Midway's cited evidence, Exh. 4 to DSOF, wholly fails to support its asser-

tion). The fact that all three documents contained materially different terms suggests that negotiations continued after each of the Buyer's Orders was filled out. The Howells were not given a copy of the first Buyer's Order, and their copy of the second Buyer's Order contained no lease term or mileage limitation. While the Buyer's Orders contained terms pertinent to financing from NMAC, both Orders omitted extensive terms of the final Lease Agreement that the parties intended to be part of their agreement. The court need not say what legal significance the Buyer's Orders once had for length or mileage, for any binding effect was lost upon execution of the Lease Agreement.

### 2. The Lease Agreement

■ Even if the first Buyer's Order was at one time binding concurring length and mileage of a lease and was not superseded by the second Buyer's Order, which was silent on both, the first Order was superseded by the Lease Agreement. Several facts compel this conclusion. First, the terms of the Lease Agreement are materially different from the Buyer's Orders. The Lease Agreement extended the term by three months and did away with the 12,000 mile limitation in the first Buyer's Order. Second, it is undisputed that Midway offered the Howells the Lease Agreement and they accepted by signing the Lease Agreement. The integration clause contained in Midway's own contract of adhesion conclusively supersedes any inconsistent terms in the Buyer's Orders, whether they are viewed as binding or merely as evidence of prior negotiations.

PSOF ¶ 9 (stating that the "Lease is the entire agreement" and that "[t]here are no other written or verbal agreements"). Thus, on the face of the documents, the parties' contractual obligations as relevant to this action are set by the Lease Agreement.

### 3. Midway's Unilateral Mistake in Preparing the Lease Agreement.

■ At oral argument Midway acknowledged that its preparation and submission to the Howells of a Lease Agreement showing a thirty-nine month term with "N/A" in the section concerning mileage limitation was a unilateral mistake, not expressing its actual intention. Though no one from Midway recalled discussing a mileage limitation with the Howells and the Howells said they did not, Midway's employees said they always discuss mileage limitations. This is sufficient for a trier of fact to conclude that the Howells had reason to know that the no mileage limitation term in the Lease Agreement was a mistake on Midway's part. Assuming Midway meets the other conditions of a remediable unilateral mistake,[1] Midway's only remedy was avoidance of the contract. *Restatement (Second) of Contracts* § 153. Midway denied at oral argument ever having disavowed the Lease Agreement as tendered to and accepted by the Howells.

Moreover, Midway lost any right it had to avoid the Lease Agreement when, after discovering its mistake, it did not "within a reasonable time manifest to the other party [its] intention to avoid it." *Id.* § 381(2). Any belated avoidance when the Howells

---

1. Those requirements are stated in the *Restatement (Second) of Contracts* § 153:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear

the risk of a mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of a mistake or his fault caused the mistake.

first learned of Midway's alteration is further barred because by then "the contract ha[d] been so far performed or the circumstances ha[d] otherwise so changed that avoidance would be inequitable . . . ." *Id.* Midway further forfeited any right to avoidance when, as discussed below, it retained the executed Lease Agreement, unilaterally altered it, and assigned it to Nissan Motor Acceptance Corporation, thus acting with respect to the Lease Agreement "in a manner inconsistent with disaffirmance," *id.* § 380(2), and allowing the Howells to fully perform relying on terms of the Lease Agreement as signed by them.

Therefore, Midway both affirmed the unaltered Lease Agreement and lost by delay and other inequitable conduct any right of avoidance from its unilateral mistake in tendering the Lease Agreement without a mileage limitation. This is so even if the Howells had reason to believe that the no mileage limitation term was a mistake of expression on Midway's part. Thus, Midway's claimed unilateral mistake in drafting the Lease Agreement did not loose its binding effect or change the Howells' and Midway's contractual obligations under its terms.

### 4. The Alteration of the Lease Agreement

The Howells' copy of the Lease Agreement shows a thirty-nine month term with no mileage limitation. At some point after the Howells were given their copy and before it was sent to NMAC, Midway's copy of the Lease was altered to add a 15,000 mile limitation. Based on the sequence of events and the absence of evidence to the contrary, the only possible conclusion to be drawn is that Midway altered the Lease Agreement while it was in its possession—a fact Midway does not deny. It is undisputed that the alteration was unilateral and without the Howells' authorization. The Howells now contend that the alteration was a breach of contract.

Midway argues that it was lawfully entitled to alter the Lease Agreement to add the 15,000 mileage limitation because the Howells understood that there would be a mileage limit in the contract. Even if the Howells "understood" that there would be some kind of mileage limit, Midway acknowledged at oral argument that it has no evidence that the Howells ever agreed to a 15,000 mile limit or to a combination of a thirty-nine month term and a 15,000 mile limit. Even apart from that acknowledgment, there is no evidence in the record on these motions that the Howells ever agreed in fact to a 15,000 mile limit or to a combination of a thirty-nine month term and a 15,000 mile limit. As noted above, the integration clause in Midway's own form Lease Agreement extinguished any prior agreements with respect to the subject of the Lease Agreement, which plainly includes the express terms of Lease Agreement that the term is thirty-nine months with no mileage limitation. That would extinguish any previously binding provision of the first Buyer's Order setting a thirty-six month term and a 12,000 mile per year limit-which is not even the content to which Midway altered the Lease Agreement after the Howells signed it.

■ Moreover, Midway has cited no legal principle or authority, and the Court has found none, that a writing containing a unilateral mistake of expression may be altered unilaterally by the mistaking party to read as the mistaking party intended it to read, much less sold as altered to a third party as though the other party had executed it in its altered form. As noted above, Midway's sole remedy for unilateral mistake was to void the Lease Agreement by giving prompt notice to the Howells, who then would have been bound to rescis-

sion if they did not then agree to the altered terms of the Lease Agreement.

 Midway's unilateral alteration of the Lease Agreement is a breach of the implied covenant of good faith and fair dealing, which is implicit in every Arizona contract. *See Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). The purpose of the implied covenant of good faith and fair dealing is so "neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings,* 151 Ariz. at 153–54, 726 P.2d at 569–70. The implied covenant is breached when one party prevents the other party to the contract "from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). Midway attempted to deprive the Howells of the benefit the no mileage limit by adding a 15,000 mile limit before assigning the Lease Agreement to NMAC. Even if the Howells had previously agreed to some mileage limitation, the integrated Lease Agreement had no mileage limitation. By preventing the Howells from receiving the benefits of the Lease Agreement they signed and to which Midway was bound by its failure to rescind for unilateral mistake, Midway breached the implied covenant of good faith and fair dealing implicit in the Lease Agreement.

The Howells allege that they suffered foreseeable damages as a result of Midway's breach. *See Restatement (Second) of Contracts* § 351 (stating that damages are not recoverable for a loss the breaching party had no reason to foresee as a probable result of the breach). Midway could have foreseen that alteration of the Lease Agreement would cause the assignee, NMAC, to try to hold the Howells to the altered terms of the Lease Agreement

and to charge them with breaching the contract if they exceeded the inserted mileage limit and failed to pay. NMAC did just that and reported the account as a charge-off when the Howells did not pay for the excess mileage, thus defaming their credit for non-payment of a debt they did not owe. Whether the Howells suffered actual damage from NMAC's defamation of their credit is a fact question for the jury to decide.

In sum, there is no triable issue of fact as to whether Midway made a unilateral, unauthorized alteration to the Lease Agreement, thereby breaching the implied covenant of good faith and fair dealing. Accordingly, the Howells are entitled to summary judgment for liability on the breach of contract claim, subject only to the possibility of further consideration of Midway's reformation counterclaim as discussed below.

### 5. Reformation.

Midway pleads a counterclaim to reform the Lease Agreement to read as Midway unilaterally altered it, that is, to impose a 15,000 mile per year limit. By order of March 3, 2005, the Court advised the parties that it was considering entering summary judgment against that counterclaim, though the Howells had not moved for summary judgment on that counterclaim. The Court further directed the parties to be prepared at oral argument on March 22, 2005, to state whether there is any evidence, in the record or otherwise, that the Howells had "agreed orally or in any other way to a thirty-nine month lease with a 15,000 mile annual limitation, which are the terms of the altered Lease Agreement." At oral argument Midway could point to no such evidence but asked for time to try to submit such evidence.

 Reformation is available only if both parties previously agreed in fact to

the term to which the writing would be reformed. *Restatement (Second) of Contract* § 157, cmt. b. & illustration 4. "If one party sends to the other party an offer which, because of a mistake, does not reflect the offeror's intention, the rule stated in this Section [permitting reformation] does not apply both because only one party is mistaken and because there was no prior agreement. The mistaken party's remedy, if any, in that case is not reformation but avoidance under the rule stated in § 153." *Id.* § 155, cmt. b. On Midway's acknowledgment that it has no evidence that the Howells ever agreed in fact to the combination of terms to which Midway altered the Lease Agreement, as a matter of law Midway can have no claim to reformation. However, because the Howells did not move for summary judgment against the reformation counterclaim, the Court out of an abundance of fairness to Midway allowed them two additional weeks to submit any evidence that the Howells had in fact previously agreed to the term to which Midway would reform the Lease Agreement.

■ In addition, a right to reformation is lost if not sought before the other party detrimentally changes position and if the mistaking party is guilty of "failure to act in good faith and in accordance with reasonable standards of fair dealing." *Id.* § 157. While it seems apparent that Midway's alteration of the Lease Agreement without knowledge of the Howells or NMAC and its assignment as altered, to the foreseeable injury of the Howells, falls far short of good faith and reasonable standards of fair dealing, the Court will await Midway's supplemental filing concerning its reformation counterclaim before making a final summary judgment ruling on the reformation counterclaim.

## B. Arizona Consumer Fraud Act Claim

Midway also moves for summary judgment on the Howells' state consumer fraud claim. To succeed on this claim, the Howells must show that Midway committed a deceptive or fraudulent act in connection with the sale of merchandise, that Midway intended the Howells to rely on their concealment, and that the Howells suffered a consequent and proximate injury. A.R.S. § 44–1522; *see Dunlap v. Jimmy GMC of Tucson, Inc.,* 136 Ariz. 338, 342, 666 P.2d 83, 87 (1983). At oral argument on these motions the Howells clarified that the basis for their ACFA claim is Midway's alteration of the Lease Agreement after they signed it and assignment as altered. They withdrew any ACFA claim for events before then. It is undisputed that the Midway expected NMAC to enforce the Lease Agreement against the Howells as altered and expected the Howells to continue their performance of the Lease Agreement without knowledge that the assigned Lease Agreement had been altered.

Midway argues that altering the Lease Agreement was not deceptive because Midway's employees discussed a mileage limit, the Howells had made previous leases with mileage limits, and they therefore knew that all leases have mileage limitations and this one should too. This contention already has been rejected in determining the parties' operative contract obligations. As a matter of contract law the Howells were obligated to no mileage limitation when Midway sent them on their way with their copy of the contract documents and failed to give them notice of avoidance. The evidence at most could give the Howells reason to know the unlimited mileage term was a unilateral mistake of expression by Midway. The most aggressive view of the evidence could not bind the Howells to a mileage limit with-

out their express agreement, much less to a specific mileage limit of Midway's secret selection.

■ The most the evidence and circumstances could suggest is that the Howells had reason to know the Lease Agreement reflected a drafting mistake by Midway. That conclusion would at most give Midway a right of avoidance, not a right of unilateral alteration-a remedy unknown to the law. No avoidance has ever been asserted, and any right of avoidance unquestionably was lost long before NMAC defamed the Howells' credit. Thus, Midway has not refuted as a matter of law any element of the ACFA claim for deceptively altering the Lease Agreement, assigning it to Nissan Motor Acceptance Corporation as altered, and relying on the concealment to the injury of the Howells. Midway's motion summary judgment against that ACFA claim will be denied.

### C. Punitive Damages

■ Midway also moves for summary judgment on the Howells' punitive damages claim. Punitive damages are available under the ACFA. *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577, 521 P.2d 1119, 1123 (1974). Even under the view that Midway made a unilateral mistake of expression, there is sufficient evidence for a triable issue of fact on punitive damages. That evidence is that Midway secretly altered the Lease Agreement-a fraud on both the Howells and NMAC-and assigned the altered document to NMAC knowing that NMAC would rely on the alternation and might make claims against the Howells beyond what they ever agreed to. Forgery and deception are not alternative remedies to avoidance of an voidable contract, and the conscious evil of such behavior is obvious.

Moreover, from the evidence the jury could also draw a darker picture of Midway's conduct. The forgoing discussion takes the conflicting evidence and the reasonable inferences from the evidence most favorably for Midway, as the Court must do on summary judgment, but the jury need not do so at trial. The jury could find that Midway hand wrote the "36 mo lease ... 12K/yr" notation on its copy of the first Buyer's Order after Mr. Howell signed it-as corroborated by Midway's failure to give Mr. Howell a copy and by the absence of any such term from the second Buyer's Order, which was copied to the Howells. The jury could disbelieve Midway's theory of unilateral mistake of expression in preparing the Lease Agreement with "N/A" inserted into the mileage limitation section. From Midway's own testimony that it never fills out the form that way and none of its employees are authorized to make such contract terms, the jury could disbelieve that mere inadvertence explains Midway's affirmatively filling out its form that way. The jury need not believe that an error of the wrong habits explains an affirmative choice of terms that Midway itself says never has been made and never will be.

There is also evidence that Midway committed similar fraudulent acts against other lessees. The evidence and circumstances permit an inference that in this case and in others Midway submitted one form of Lease Agreement to get it signed and then altered it to terms never agreed upon to get financing. That could have been done with conscious awareness of the dishonesty of such conduct and awareness that some times the false term will not matter and other times people will not risk defamation of their credit over small amounts of money. The jury could find a recurring artifice to defraud customers. Whether Midway's conduct was merely wrongful or also evil is for the jury to decide. Summary judgment against the punitive damage claim must be denied.

### III. Conclusion

Midway's motion for summary judgment on all remaining claims will be denied. The Howells' cross-motion for liability on the breach of contract claim will be granted, subject only to further ruling on whether Midway's counterclaim for reformation is unmeritorious as a matter of law.

IT IS THEREFORE ORDERED that Defendant Midway Holding Inc.'s Motion for Summary Judgment (Doc. # 137) is denied.

IT IS FURTHER ORDERED that Plaintiffs William and Bonnie Howell's Cross–Motion for Partial Summary Judgment (Doc. # 144) on liability for breach of contract is granted, subject to further ruling on whether Defendant Midway's counterclaim for reformation is unmeritorious as a matter of law.

IT IS FURTHER ORDERED that Plaintiffs' Motion for a Hearing on Defendant Midway's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment (Doc. # 146) is granted, as a hearing was held on March 22, 2005.